IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **TRIA WS LLC**, *et al.*, individually and on behalf of all others similarly situated,<br>Plaintiffs,<br><br>v.<br><br>**AMERICAN AUTOMOBILE INSURANCE COMPANY**,<br>Defendant. | CIVIL ACTION<br><br><br><br><br><br>NO. 20-4159 |

## MEMORANDUM OPINION

This insurance dispute, like many these days, arises from losses sustained by Tria WS LLC, Tria TR LLC, and Alaska Café LLC ("Plaintiffs") during government shutdowns brought on by the COVID-19 pandemic. Plaintiffs sue their insurer, Defendant American Automobile Insurance Company ("AAIC"), on behalf of themselves and three putative classes, asserting claims for declaratory judgment, breach of contract, and bad faith. AAIC moves to dismiss this action in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

I.     BACKGROUND

A.  The Insurance Policies

Plaintiffs own and operate wine bars and tap rooms in the city of Philadelphia. They each purchased substantially identical all-risk commercial property insurance policies from AAIC (the "Policies"), which insure Plaintiffs against various losses arising from "direct physical loss of or damage to" property.

At issue here are the Policies' Business Income, Extra Expense, Extended Business Income and Civil Authority coverage as well as an endorsement to the Policies, entitled

"Exclusion of Loss Due to Virus or Bacteria."[1]

### B. Factual Allegations and Procedural History

In late December 2019, individuals in China began falling ill with a novel coronavirus pneumonia, labelled by the World Health Organization as COVID-19.  The virus soon spread to the United States and by March 2020 was ubiquitous.  On March 6, 2020, in response to this public health crisis, Pennsylvania Governor Tom Wolf issued a Proclamation of Disaster Emergency and, ten days later, Philadelphia Mayor Jim Kenney prohibited restaurants—such as those operated by Plaintiffs—from providing in-person dining and limited their operations to delivery service or remote ordering.  Governor Wolf then mandated the statewide closure of all restaurants and bars except to the extent such businesses could offer carry-out, delivery, or drive-through services.  In June and July 2020, as conditions improved, executive orders eased the restrictions, allowing for a "limited reopening" of bars and restaurants subject to significant occupancy and other restrictions.  Plaintiffs allege that, as a result of these government actions, they were forced to "cease, suspend, and/or severely limit their business operations," which in turn cost them income and caused them to incur additional operating expenses.  To date, Plaintiffs have not regained full use of their premises.

Plaintiffs submitted insurance claims to AAIC under the Policies.  AAIC declined coverage on the contention that the losses were not covered by the Policies.  Plaintiffs then filed suit on behalf of themselves and three putative classes of "bars, restaurants, and other eateries" that were denied coverage by AAIC for losses sustained as a result of the government closure orders: (1) a "Business Income Coverage" class; (2) an "Extended Business Income Coverage" class; and, (3) a "Civil Authority Coverage" class.  Their Amended Complaint (the "Complaint")

---

[1] Pursuant to the endorsement, AAIC "will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."

asserts three counts of declaratory judgment, three counts of breach of contract, and three counts of bad faith. Counts I, IV, and VII seek a declaratory judgment that AAIC is required to pay Plaintiffs under the Policies' Business Income and Extra Expense coverages, Extended Business Income coverage, and Civil Authority coverage, respectively. Counts II, V, and VIII allege that AAIC breached its obligations under the Policies when it denied Plaintiffs coverage under these provisions. Finally, Counts III, VI, and IX allege that AAIC's coverage decisions were made in bad faith.

AAIC now moves to dismiss the Complaint in its entirety, arguing that the Policies, by their clear terms, do not afford coverage for the losses alleged by Plaintiffs.

## II.     LEGAL STANDARD

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). All factual allegations in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *N.J. Carpenters & the Trustees Thereof v. Tishman Constr. Corp. of N.J.*, 760 F.3d 297, 302 (3d Cir. 2014). When deciding a motion to dismiss, courts may consider "allegations contained in the complaint, exhibits attached to the complaint and matters of public record," *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993), as well as "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] items appearing in the record of the case," *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2004)), her the Policies at issue.

### III. DISCUSSION

Plaintiffs allege that the losses and expenses they have sustained as a result of state and local government orders designed to mitigate the spread of COVID-19 are covered under the Policies' Business Income, Extra Expense, Extended Business Income, and Civil Authority provisions. According to AAIC, all of Plaintiffs' claims must be dismissed because Plaintiffs fail to allege any "direct physical loss of or damage to" property, a threshold requirement for each of these coverages. AAIC further contends that even if Plaintiffs' losses fell within one or more of the Policies' coverage provisions, coverage for COVID-19-related losses is nevertheless precluded pursuant to the Policies' so-called virus exclusion, which bars coverage for losses "caused by or resulting from" a virus.

#### A. Principles of Policy Interpretation

The substantive law of Pennsylvania governs this diversity action. *Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000). In Pennsylvania, whether coverage exists under an insurance policy is a question of law. *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005).

"[T]he proper focus for determining issues of insurance coverage is the reasonable expectations of the insured." *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 903 (3d Cir. 1997). "In most cases, 'the language of the insurance policy will provide the best indication of the contents of the parties' reasonable expectations.'" *Id.* (quoting *Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1309 (3d Cir. 1994)). Thus, when interpreting an insurance contract, courts "look first to the terms of the policy." *Nationwide Mut. Ins. Co. v. CPB Int'l, Inc.*, 562 F.3d 591, 595 (3d Cir. 2009). "A court should not consider individual terms in isolation, but rather must consider the entire insurance provision to ascertain the parties' intent."

*Humans & Res., LLC v. Firstline Nat'l Ins. Co.*, --- F. Supp.3d ----, 2021 WL 75775, at *2 (E.D. Pa. Jan. 8, 2021) (citing *401 Fourth St., Inc. v. Inv'rs Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005)). When the language of a policy clearly and unambiguously precludes coverage, the court must give that language effect, *Allstate Prop. & Cas. Ins. Co. v. Squires*, 667 F.3d 388, 390-91 (3d Cir. 2012), unless "the insurer or its agent has created in the insured a reasonable expectation of coverage," *Moessner*, 121 F.3d at 903.

If, however, the policy language is ambiguous, "the court must construe the policy 'in favor of the insured . . . and against the insurer, as the insurer drafts the policy, and controls coverage.'" *Nautilus Ins. Co. v. Bike & Build, Inc.*, 340 F. Supp.3d 399, 408 (E.D. Pa. 2018) (quoting *Kvaerner Metals Civ. of Kvaerner U.S., Inc. v. Comm. Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006)). "Ambiguity exists where the language of the [policy] is 'reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *Gen. Refractories Co. v. First State Ins. Co.*, 855 F.3d 152, 159 (3d Cir. 2017) (quoting *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999)).

It is the insured's initial burden to prove the existence of coverage under the policy. *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009). When the insurer asserts that a policy exclusion bars coverage, the burden shifts to the insurer to establish that the exclusion applies. *Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 206-07 (3d Cir. 2001).

### B. Coverage

#### 1. *Business Income and Extra Expense Coverage*

Plaintiffs first allege that they are afforded coverage pursuant to the Policies' Business Income and Extra Expense provisions.

The Policies' Business Income coverage requires AAIC to:

> pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

A "Covered Cause of Loss" is any "direct physical loss," unless said loss is "excluded or limited" by the Policies. Extra Expense coverage works in tandem with the Business Income provision and entitles the insured to coverage for any "extra expense" incurred during the period of restoration, that is, any "necessary expenses" that the insured "would not have incurred if there had been no direct physical loss or damage to property."

At the threshold, coverage is available under these provisions only if Plaintiffs suffer a "suspension"[2] of their business operations "caused by direct physical loss of or damage to" the insured property. AAIC does not dispute that Plaintiffs' business operations were "suspend[ed]" due to government-mandated COVID-19 restrictions. Rather, AAIC contends that Plaintiffs have not, and cannot, allege a "direct physical loss of or damage to" their properties sufficient to trigger these coverages.

This dispute is not the first time that insureds have done battle with their insurers regarding COVID-related suspensions. Cases like this one are being litigated across the country. To try and establish physical loss or damage, business owners seeking coverage for COVID-19-related losses have typically proceeded on one of two theories. The first is the "physical contamination" theory, whereby business owners allege that the virus was physically present on their properties, thus making the insured premises unsafe for use. *See, e.g.*, *Studio 417, Inc. v.*

---

[2] "Suspension" is defined to mean "[t]he slowdown or cessation of [the insured's] business activities."

*Cincinnati Ins. Co.*, 478 F. Supp.3d 794, 802 (W.D. Mo. 2020) (denying insurer's motion to dismiss where plaintiffs alleged that COVID-19 "particles attached to and damaged" their property); *Blue Springs Dental Care, LCC v. Owners Ins. Co.*, 488 F. Supp.3d 867, 876-77 (W.D. Mo. 2020) (denying insurer's motion to dismiss where plaintiffs alleged that "COVID-19 had physically occupied and contaminated their dental clinics," rendering them unusable).

The second is the "loss of use" theory. This theory is not premised on COVID-19 contamination or any other specific condition of or on the insured premises. Instead, its advocates assert that the significant restrictions imposed by the government on the manner and degree to which business owners may use their premises are sufficient, on their own, to establish "direct physical loss of" property. *See, e.g.*, *Michael Cetta, Inc. v. Admiral Indem. Co.*, --- F. Supp.3d ----, 2020 WL 7321405, at *5-6 (S.D.N.Y. Dec. 11, 2020). Plaintiffs here proceed solely on this "loss of use" theory, alleging that they have suffered a "direct physical loss" of the insured premises because the government's social distancing orders have prevented them from fully utilizing their physical premises for the property's intended business purposes. AAIC, on the other hand, argues that the phrase "direct physical loss of" property unambiguously requires some change in the physical condition of the insured premises, which Plaintiffs fail to allege.

Thus, the meaning of the terms "direct," "physical," and "loss" is central to the resolution of this dispute. None of these terms are defined in the Policies. This does not, however, necessarily render them ambiguous. *See Humans & Res.*, --- F. Supp.3d at ----, 2021 WL 75775, at *7. Rather, "'[w]ords of common usage in an insurance policy are construed according to their natural, plain, and ordinary sense,' and thus 'we may consult the dictionary definition of a word to determine its ordinary usage.'" *Id.* (quoting *Kvaerner*, 908 A.2d at 897). Thus, "direct" is defined as "proceeding from one point to another in time or space without

deviation or interruption"; "stemming immediately from a source"; or "characterized by close logical, causal, or consequential relationship." *Direct*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/direct. "Physical" is defined as "having material existence: perceptible especially through the senses and subject to the laws of nature" or "characterized or produced by the forces and operations of physics." *Physical*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/physical. "Loss" is defined as "destruction, ruin"; "the act of losing possession"; or "failure to gain, win, obtain, or utilize." *Loss*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/loss.

Plaintiffs are thus correct that a "loss" of property could include the inability to possess or utilize the property for its intended purpose. But when modified by the terms "direct" and "physical," the term "loss" is no longer reasonably susceptible to Plaintiffs' proffered definition. Given its ordinary meaning, the phrase "direct physical loss of" property requires that the property be rendered unusable by some physical force. This in turn requires that the insured's "loss of use" bear some causal connection to the condition of the premises, such as where a fire burns down an insured restaurant or a thief steals all of the restaurant's cooking equipment, thereby rendering the property unusable for its intended purpose. *See 4431, Inc. v. Cincinnati Ins. Co.*, --- F. Supp.3d ----, 2020 WL 7075318, at *10 (E.D. Pa. Dec. 3, 2020); *Humans & Res.*, --- F. Supp.3d at ----, 2021 WL 75775, at *6. Plaintiffs' "loss of use" theory does not fall within this definition. As one court illustrates:

> The idea that "loss of use" does not constitute "direct physical loss of or damage to" property resonates in ordinary experience outside the context of insurance coverage. Say, for example, a teenager broke curfew, and his parents punished him by taking away the keys to his car. The teen undoubtedly lost the ability to use the car. However, we would not say that there had been a "direct physical loss of or damage to" the car. The teenager was [merely] precluded from driving it.

*Michael Cetta, Inc.*, --- F. Supp.3d at ----, 2020 WL 7321405, at *6.  While there is no dispute that Plaintiffs here have been precluded from fully using the insured premises by the government closure orders, the Complaint does not allege that any physical force has rendered the premises unusable or otherwise affected the condition of the property.  Thus, Plaintiffs' Complaint fails to allege a "direct physical loss of" the insured property, and fails to trigger coverage under the Policies' Business Income and Extra Expense provisions.

In any event, even if the phrase "direct physical loss" were ambiguous when considered in isolation, when the phrase is considered in its broader context, Plaintiffs' "loss of use" theory is clearly untenable.  The Policies provide coverage only for business income losses sustained due to the suspension of the insured's operations during the "period of restoration," which, by the terms of the Policies, ends on either the "date when the [insured property] should be repaired, rebuilt or replaced with reasonable speed and similar quality" or the "date when business is resumed at a new permanent location."  The terms "repair," "rebuild," and "replace" strongly suggest that the insured property must have suffered some negative change in its physical condition rendering the property unsatisfactory and requiring restoration.[3]  As Plaintiffs themselves appear to concede, the Policies' "period of restoration" requirement would be

---

[3] Plaintiffs attempt to render the Policies' "period of restoration" language ambiguous by looking to other policy provisions which, they suggest, support their "loss of use" theory.  They point, for instance, to the Policies' definition of "suspension," which includes situations where "part or all of the [insured premises] is rendered untenantable."  Plaintiffs suggest that property may be "rendered untenable" even where the property has suffered no change in its physical condition if the insured is precluded, by government order or otherwise, from accessing or utilizing the property.  Not so.  Although the term "untenantable" is not defined in the Policies, it ordinarily requires a property to be "incapable of being occupied or lived in."  *Untenantable*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/untenantable.  A government closure order which restricts an insured's ability to access or use the insured property does not render the property incapable of being occupied or lived in; the premises remain fully capable of performing their former functions, even if the insured is temporarily precluded from fully utilizing the property.  *See Town Kitchen LLC v. Certain Underwriters at Lloyd's, London*, 2021 WL 768273, at *5 (S.D. Fla. Feb. 26, 2021) ("In my opinion, the key difference between the Plaintiff's loss of use theory and something clearly covered—like a hurricane—is that the property did not change.  The world around it did.  And for the property to be useable again, no repair or change can be made to the property—the world must change.").

rendered superfluous if Plaintiffs' understanding of "direct physical loss" were accepted. *See Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 163 (3d Cir. 2011) (courts must "take care not to render other portions of a provision or contract superfluous when construing contract language" (quoting *New Castle Cty., Del. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 174 F.3d 338, 349 (3d Cir. 1999))); *see also Kahn v. Pa. Nat'l Mut. Cas. Ins. Co.*, --- F. Supp.3d ----, 2021 WL 422607, at *6 (M.D. Pa. Feb. 8, 2021) ("If we adopt Plaintiffs' proposed construction—that "physical loss" could include a loss of the business's intended function—this language in the definition of "period of restoration," plus the phrase itself, would be rendered entirely superfluous."); *Toppers Salon & Health Spa, Inc. v. Travelers Prop. Cas. Co. of Am.*, --- F. Supp.3d ----, 2020 WL 7024287, at *4 (E.D. Pa. Nov. 30, 2020) ("The parties' agreement to measure the period of restoration against the time it takes to repair the premises indicates that they intended the Policy to cover losses for physical damage, and that intent controls the Court's interpretation of the Policy.").

Similarly, the Policies' Civil Authority provision is meaningless under Plaintiffs' proffered understanding of "direct physical loss."[4] This provision, as discussed in more detail below, provides an insured with coverage if damage to a nearby property causes a civil authority to prohibit access to the insured's property. If mere loss of use were sufficient to constitute a

---

[4] The provision provides as follows:

> When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:
> (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and
> (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

"direct physical loss of" the insured property, there would be no need for this Civil Authority provision, as any business income losses resulting from a civil authority's prohibition on accessing the insured premises would necessarily be covered under the Business Income and Extra Expense provisions. *See Frank Van's Auto Tag LLC v. Selective Ins. Co. of the Se.*, --- F. Supp.3d ----, 2021 WL 289547, at *6 (E.D. Pa. Jan. 28, 2021) (noting the same).

In response, Plaintiffs contend that reading "direct physical loss" to require some change to the physical condition of the insured premises impermissibly conflates "loss" and "damage," rendering the term "damage" in the phrase "direct physical loss of or damage to" property meaningless. That does not follow. For instance, a hurricane could cause direct physical damage to an insured property where strong winds blow off the property's roof. By the same token, it could cause a direct physical loss of the property where strong winds completely destroy the building. *See Real Hosp., LLC v. Travelers Cas. Ins. Co. of Am.*, --- F. Supp.3d ----, 2020 WL 6503405, at *6 (S.D. Miss. Nov. 4, 2020) ("[I]n a restaurant with ten tables, there could be a fire, which completely burns up five of the tables—thus, there is a 'direct physical loss of property.' The fire also could melt the tabletops or cause smoke damage to the remaining five tables—thus, there is 'damage to property.'"). In other words, the terms "damage" and "loss" are not interchangeable, but instead indicate the degree to which the insured property has suffered a negative physical change.

Plaintiffs also rely on *Port Authority of New York and New Jersey v. Affiliated FM Insurance Co.*, 311 F.3d 226 (3d Cir. 2002). In that case, the Third Circuit, applying New Jersey law, considered whether asbestos contamination at an insured property constituted "physical loss or damage." The court noted that, in the asbestos context, an insured may suffer "physical loss" of property even if the property remains structurally unaltered. *Id.* at 235-36. It explained:

> When the presence of large quantities of asbestos in the air of a building is such as to make the structure uninhabitable and unusable, then there has been a distinct loss to its owner. However, if asbestos is present in components of a structure, but is not in such form or quantity as to make the building unusable, the owner has not suffered a loss. The structure continues to function—it has not lost its utility.

*Id.* at 236. The court concluded:

> "[P]hysical loss or damage" occurs only if an actual release of asbestos fibers from asbestos containing materials has resulted in contamination of the property such that its function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable, or if there exists an imminent threat of the release of a quantity of asbestos fibers that would cause such loss of utility.

*Id.*; *see also Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823, 826-27 (3d Cir. 2005) (upholding *Port Authority*'s holding under Pennsylvania law, finding that well water contaminated with e-coli bacteria could constitute a "physical loss" of property if the contamination "nearly eliminated or destroyed" the functionality of the property or rendered the property "useless or uninhabitable").

Analogizing to *Port Authority*, Plaintiffs argue that they suffered a "direct physical loss" because the government orders "outright prevented [Plaintiffs] from physically accessing, occupying and operating their insured premises," thus eliminating their properties' functions and rendering them "useless or uninhabitable." Initially, they argue from false premises: The government orders—attached by Plaintiffs to their Complaint—do not place any restrictions on Plaintiffs' ability to physically access or occupy their properties. Rather, they place limitations on the ways in which Plaintiffs may utilize their properties, with the initial orders preventing Plaintiffs from offering dine-in services (but permitting Plaintiffs to offer take-out and delivery services) and the most recent orders, among other things, restricting the number of customers allowed in Plaintiffs' restaurants at any given time.

12

More critically, however, Plaintiffs' factual allegations differ materially from those of the *Port Authority* plaintiffs. Consistent with the understanding of "direct physical loss" outlined above, the latter plaintiffs alleged the physical presence of a harmful contaminant on the insured premises which rendered those premises useless. *See Port Auth.*, 311 F.3d at 235-36; *see also Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, 2014 WL 6675934, at *6 (D.N.J. Nov. 25, 2014) (coverage available for losses from ammonia release, where "there [was] no genuine dispute that the ammonia release physically transformed the air within [the insured premises] so that it contained an unsafe amount of ammonia or that the heightened ammonia levels rendered the [premises] unfit for occupancy until the ammonia could be dissipated"); *TRAVCO Ins. Co. v. Ward*, 715 F. Supp.2d 699, 708 (E.D. Va. 2010) (coverage available for losses due to sulfuric gas released by drywall because "physical damage to the property is not necessary, at least where the building in question has been rendered unusable by physical forces"). Plaintiffs here are not proceeding on a similar "physical contamination" theory and instead allege only that their loss of use was caused by government use restrictions, untethered to any specific unsatisfactory condition of or on the insured premises. Contrary to Plaintiffs' position, the Third Circuit's decision in *Port Authority* supports a finding that an insured does not suffer a "direct physical loss of" property where, as here, the physical premises remain in satisfactory, operable condition.

This conclusion accords, moreover, with the general purpose of first-party property insurance policies like the ones at issue here, which are written to protect insureds "against loss caused by injury to the insured's own property." *See Port Auth.*, 311 F.3d at 233. As other courts have noted, if first-party property coverage were to be extended in the manner suggested by Plaintiffs, insurers would potentially become "liable for the negative effects of operations

13

changes resulting from any regulation or executive decree," *see Henry's La. Grill, Inc. v. Allied Ins. Co. of Am.*, --- F. Supp.3d ----, 2020 WL 5938755, at *5 (N.D. Ga. Oct. 6, 2020), such as, for instance, a regulation that lowers a city's maximum occupancy codes, thereby preventing the city's restaurants from seating as many customers as they used to, *see Plan Check Downtown III, LLC v. Amguard Ins. Co.*, 485 F. Supp.3d 1225, 1232 (C.D. Cal. 2020).

For these and other reasons, the vast majority of courts to have considered Plaintiffs' "loss of use" theory have found for the insurers. *See, e.g.*, *4431, Inc.*, --- F. Supp.3d at ----, 2020 WL 7075318, at *10 (granting insurer's motion to dismiss, finding "economic loss resulting from an inability to utilize a premises as intended must (1) bear some causal connection to the *physical* conditions of that premises, which conditions (2) operate to completely or near completely preclude operation of the premises as intended"); *Kahn*, --- F. Supp.3d at ----, 2021 WL 422607, at *5 (granting insurer's motion to dismiss, finding "the phrase 'physical loss of or damage to property' unambiguously requires some issue with the physical premises that impedes business operations"); *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 487 F. Supp.3d 834, 841 (N.D. Cal. Sept. 14, 2020) (granting insurer's motion to dismiss, finding "that some outside physical force must have *induced* a detrimental change in the property's capabilities before a plaintiff alleging loss of use can establish a 'direct physical loss of property'"); *Promotional Headwear Int'l v. Cincinnati Ins. Co.*, --- F. Supp.3d ----, 2020 WL 7078735, at *7 (D. Kan. Dec. 3, 2020) (granting insurer's motion to dismiss, noting that "when modified by the terms 'direct' and 'physical,' coverage is triggered when there is either 'permanent dispossession' of the property, or where the property itself becomes unusable or uninhabitable due to a material intrusion").

Plaintiffs identify a handful of cases to the contrary, none of which offers a persuasive

analysis of the policy terms at issue.[5]  The Policies are not reasonably susceptible to Plaintiffs' proffered definition of "direct physical loss," and Plaintiffs do not otherwise plead facts sufficient to state a prima facie case of coverage under the Policies' Business Income and Extra Expense provisions.  Plaintiffs are thus not entitled to Business Income or Extra Expense coverage under the terms of their Policies.

### 2. *Extended Business Income Coverage*

Plaintiffs also seek coverage under the Policies' Extended Business Income provision, which reimburses an insured for business income losses that continue after the period of restoration ends as follows:  However, by its clear terms, this provision applies only where the insured has satisfied the initial condition of showing a "Business Income loss payable under the policy."  Because Plaintiffs fail to allege facts sufficient to trigger Business Income coverage, they are necessarily precluded from seeking Extended Business Income coverage.

---

[5] Out of the numerous cases submitted by Plaintiffs, the Court has identified only four decisions which expressly support Plaintiffs' proffered definition of "direct physical loss."  In *Henderson Road Restaurant Systems, Inc. v. Zurich American Ins. Co.*, --- F. Supp.3d ----, 2021 WL 168422 (N.D. Ohio Jan. 19, 2021), and *North State Deli, LLC v. Cincinnati Ins. Co.*, 2020 WL 6281507 (N.C. Super. Oct. 9, 2020), the courts interpreted "direct physical loss" to include "the inability to possess something in the real, material or bodily world, resulting from a given cause without the intervention of other conditions," *Henderson Road*, 2021 WL 168422, at *5.  These courts did not, however, attempt to reconcile this interpretation with the rest of the policies' coverage provisions—such as their "repair, rebuild, or replace" language—which, again, militate against Plaintiffs' proffered definition.  The Northern District of Illinois' decisions in *In re Society Ins. Co. COVID-19 Business Interruption Protection Ins. Litig.*, 2021 WL 679109 (N.D. Ill. Feb. 22, 2021), and *Derek Scott Williams PLLC v. Cincinnati Ins. Co.*, 2021 WL 767617 (N.D. Ill. Feb. 28, 2021), did consider the Policies' other provisions, but contort these provisions far beyond their ordinary meaning, *see Occidental Fire & Cas. Co. of N.C. v. Reber Corp.*, 2004 WL 1529176, at *3 (E.D. Pa. June 28, 2004) (courts may not "rewrite the insurance contract, under the guise of judicial interpretation, to expand the coverage beyond that as provided in the policy" (quoting *Guardian Life Ins. Co. v. Zerance*, 479 A.2d 949, 953 (Pa. 1984))).  In *Derek Scott*, for instance, the court suggests that an insured's "'loss' would be 'repaired' if and when orders by governmental authorities permitted full use of the property." 2021 WL 767617, at *4.  As ordinarily understood, however, a property is "repaired" only when it is "restore[d] to a sound or healthy state."  *Repair*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/repair.  Similarly, in a recently issued opinion, the Pennsylvania Court of Common Pleas found that "the installation of partitions, additional handwashing/sanitization stations, and the installations or renovation of ventilation systems" would "undoubtedly constitute 'repairs' or 'rebuilding' of property."  *See Ungarean v. CNA*, No. GD-20-006544 (Pa. Com. Pl. Mar. 22, 2021).  This Court is not convinced.  In ordinary parlance, we repair what is broken, and Plaintiffs have not alleged any unsatisfactory condition on the insured properties in need of fixing.

15

### *3. Civil Authority Coverage*

Finally, Plaintiffs allege that they are due coverage pursuant to the Policies' Civil Authority provision. Unlike the above coverages, which address "physical loss of or damage to" the insured premises, Civil Authority coverage addresses potential losses caused by "damage to property other than" the insured premises. If, because of damage to other property, a civil authority "prohibits access to" the insured property, then AAIC will reimburse the insured for resulting loss of business income and extra expense if the nature of the civil authority's prohibition otherwise meets the coverage criteria. This type of coverage thus requires Plaintiffs to plead, at minimum: (1) that there was damage to property other than their own; and, (2) that the civil authority's action "prohibit[ed] access to" the insured premises. *See Michael Cetta, Inc.*, --- F. Supp.3d at ----, 2020 WL 7321405, at *11.

Plaintiff do not allege facts sufficient to meet either requirement. The Complaint does not contain any allegations concerning damage to property other than the insured premises. The Complaint also does not allege that the government closure orders prohibited Plaintiffs from accessing their properties; indeed, the orders at all times permitted Plaintiffs to access the insured premises to prepare food for delivery and take-out service and, later, to resume limited in-person dining. *See 4431, Inc.*, --- F. Supp.3d at ----, 2020 WL 7075318, at *13 ("[I]t is clear that Plaintiffs' ability to continue limited takeout and delivery operations at the premises precludes coverage under the Civil Authority provision: a prohibition on access to the premises, which is a prerequisite to coverage, is not present."); *Indep. Rest. Grp. v. Certain Underwriters at Lloyd's, London*, --- F. Supp.3d ----, 2021 WL 131339, at *8 (E.D. Pa. Jan. 14, 2021) ("The government orders did not prohibit IRG from accessing the property to provide takeout, and, while orders barred the public from *dining* at the premises and, for a time, from ordering to-go food inside the

premises, the public was never barred from accessing the premises to pick-up food.").

In sum, none of the policy provisions cited by Plaintiffs provide coverage for the losses alleged in their Complaint.[6] Indeed, the language of the Policies clearly and unambiguously precludes coverage.[7]

### C. Leave to Amend

Courts must grant plaintiffs leave to amend their complaint where justice so requires. Fed. R. Civ. P. 15(a)(2). "Leave to amend may be denied, however, if amendment would be futile," that is, "if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted." *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000). Here, Plaintiffs have already submitted a first amended complaint. Although Plaintiffs request, in their briefing, leave to submit a second amended complaint, they propose no amendments nor identify any additional factual allegations that might cure the deficiencies in their operative Complaint and the Court can see none. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332 (3d Cir. 2002). Leave to amend will accordingly be denied.

### IV. CONCLUSION

For the foregoing reasons, AAIC's Motion to Dismiss will be granted and Plaintiffs' Complaint will be dismissed with prejudice. An appropriate order follows.

**March 30, 2021**　　　　　　　　　　　　　　　　**BY THE COURT:**

　　　　　　　　　　　　　　　　　　　　　　　　　　**/s/Wendy Beetlestone, J.**

　　　　　　　　　　　　　　　　　　　　　　　　　　**WENDY BEETLESTONE, J.**

---

[6] Further, because the language of the Policies clearly precludes coverage, the applicability of the virus exclusion need not be addressed.

[7] Plaintiffs bring this action under Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and all others similarly situated. Because Plaintiffs' Complaint will be dismissed in its entirety, Plaintiffs' class allegations are not reached. *See Estate of Gleiberman v. Hartford Life Ins. Co.*, 94 F. App'x 944, 948 (3d Cir. 2004) (district court did not abuse its discretion by "determining that the named plaintiffs had failed to state a claim upon which relief could be granted prior to deciding the issue of class certification").